PITTMAN, Judge.
Robert Ford Burkett (“the husband”) appeals from a judgment divorcing him from Anne Winkler Burkett (“the wife”) that, among other things, divided the parties’ marital property and assets, awarded primary physical custody of the parties’ children to the wife, and ordered the husband to pay child support and to maintain a $500,000 life-insurance policy for the benefit of the children.
The parties were married in 1991; two children were born during the marriage: a daughter, who was born in 1994 and a son, who was born in 1998. The husband had been self-employed as an insurance agent and an investment banker throughout the marriage; the evidence established that his gross monthly income had been $8,105.50 in 2007 and $3,666.17 in 2008. The wife had been employed by the Madison County Commission for most of the marriage; at the time of trial, the wife was serving as the county’s economic-development director and had earned a monthly gross income of $5,235.43 in 2007 and $5,470.54 in 2008.
In March 2007, the husband filed a complaint seeking, among other things, a divorce from the wife, an award of joint legal and physical custody of the children, an equitable division of the marital assets, and an allocation of the marital debts. The wife filed an answer; she also filed a counterclaim in which she sought primary physical custody of the children, an award of child support, an equitable division of the marital assets and allocation of the marital debts, and an award of attorney fees. The wife also requested that the trial court instruct the parties to split the household costs equally during the pen-dency of the divorce action.
A pendente lite order was entered in June 2007 that instructed the parties to maintain the status quo during the pen-dency of the litigation. In January 2008, the wife requested that the trial court appoint a special master to assess the value of the husband’s insurance agency and investment business. Following a hearing on the matter, in October 2008, the trial court appointed a special master who was instructed to determine both the “fair market value” and the “fair value” of the husband’s businesses for consideration at the divorce trial. Subsequently, the wife filed a motion seeking a contempt judgment against the husband for his alleged failure to maintain the status quo regarding household expenses pendente lite. Following a hearing in March 2009, the trial court modified the pendente lite order by ordering the parties to share the monthly house *546 hold expenses on a pro rata basis. The order instructed the husband to deposit $1,437.08 monthly into a joint checking account, directed the wife to deposit $3,353.17 monthly into the same account, mandated that all monthly bills be paid from that account, and required that accurate records of that account be maintained.
The divorce trial was conducted between September 29 and October 1, 2009. During that ore tenus proceeding, the parties, the children’s paternal grandmother, and the parties’ teenaged daughter testified. In addition, John McKinney, a vocational evaluator, and Dr. Joan Kerr, a child psychologist, testified.
During the trial, the husband testified that he had first experienced concerns about the parties’ marriage during the daughter’s infancy. He stated that the wife would typically fly into hysterical rages, hitting him and throwing objects; he stated that, although those rages had occurred only about once each year for the first part of the marriage, the wife’s temper had become progressively worse until, by 2005, he reportedly could not tolerate her tantrums any longer and began planning to seek a divorce. The husband stated that one of his ongoing problems with the wife was the fact that he had been reared as a Methodist and that she was a member of the Christian Science Church, \yhich he considered to be a “strange” faith.
Another factor in the husband’s decision to seek a divorce was the wife’s allegedly deteriorating relationship with the daughter. The husband asserted that the wife had been abusive toward him and the daughter throughout the marriage; however, he admitted that the wife had never injured him physically. The husband contended that the daughter’s school problems had been caused by her deteriorating relationship with the wife. He stated that he could not tolerate the arguments between the wife and the daughter over schoolwork and curfews, and, based upon his belief that he had a better relationship with the daughter, the husband orally changed his custody request to seek an award of primary physical custody of the children.
The wife stated that she had been the primary caregiver for the children throughout the marriage. She also testified that she had been worried about the daughter for several years before finally taking the daughter to a child psychologist recommended by the husband, Dr. Kerr. Initially, the wife thought the daughter might have attention deficit disorder (“ADD”), but she learned that the daughter suffered from oppositional defiant disorder (“ODD”). That problem had caused the daughter to defy her teachers and to fail subjects in school because she would not complete her homework. The wife stated that, although she and the daughter had engaged in loud confrontations in the past, the daughter was presently learning to do what was expected in school and at home after receiving Dr. Kerr’s help. The wife reasserted at trial her request that she be awarded primary physical custody of the children.
The wife testified that she had tried to encourage the husband to find more lucrative employment, but she stated that he had resisted. She noted that, during discovery for the divorce, she had learned that the husband had paid his staff more than he paid himself from his business, and she stated that his unwillingness to support the family had disgusted her. She accused the husband of intentionally earning less than he could in order to force her to pay most, if not all, of the household expenses. The wife testified, and the husband admitted during cross-examination, that the husband had failed to comply with *547 the trial court’s pendente lite order to pay one-third of the family’s living expenses before trial. The wife’s documentation that the husband owed $23,624.58 as reimbursement to her for not paying those household expenses was admitted into evidence without objection.
The children’s paternal grandmother testified that, during the marriage, she had regularly kept the children after school and had often provided supper for the whole family two nights a week. She stated that, although the daughter disobeyed the wife, the paternal grandmother had been better able to control the daughter’s behavior. In addition, the paternal grandmother stated that she believed that the daughter’s personality issues stemmed from her tempestuous relationship with the wife that dated back to the daughter’s early childhood. She said that she remembered several occasions when the wife had grabbed the daughter’s arm, digging her fingernails into the arm to get the daughter’s attention or to discipline the daughter. The paternal grandmother opined that the husband had exerted a more calming influence on the daughter and suggested that, because she was a retired schoolteacher, she could help the husband work through the daughter’s academic problems if he received primary physical custody of the children.
The daughter’s testimony was surprisingly mild in light of the husband’s contentions that the wife had physically and emotionally abused her. Essentially, the daughter related that the wife had never truly injured her, but had only scratched her arm with her fingernails and spanked her with a ruler. The daughter testified that when she misbehaved or performed poorly in school, the wife would customarily remove privileges or restrict her extracurricular activities rather than resort to corporal punishment. The daughter testified that the husband had made an agreement with her to give her certain privileges if she did her homework and performed well in school. However, the daughter stated, she was still not completing all of her homework and, at the time of trial, was failing several subjects. She also noted that the husband almost never had disciplined her, regardless of whether she had disobeyed his instructions. The daughter also testified that, although she knew both parents loved her, she would have more freedom and less structure if she were to live with the husband.
Dr. Kerr, the daughter’s counselor, testified that she had been hired by the wife to help diagnose and treat the daughter before the husband filed his divorce complaint. The wife specifically asked Dr. Kerr to help her improve her relationship with the daughter and to help the daughter improve her grades and performance in school. Dr. Kerr had ruled out ADD but had diagnosed the daughter with ODD and intermittent explosive disorder. Dr. Kerr noted that the daughter had a longstanding pattern of poor cooperation, defiance of rules, disregard for authority, hysterical outbursts, and temper tantrums. The daughter had a history of being aggressive with her teachers and other adults; in addition, she often verbally denigrated, and acted aggressively toward, her younger brother and her parents.
In reviewing the daughter’s two and one-half years of treatment, Dr. Kerr noted that the husband had continuously exhibited poor parenting techniques in dealing with the daughter’s problems; Dr. Kerr concluded that his refusal to follow recommended procedures had reinforced the daughter’s oppositional tendencies. Dr. Kerr testified that, historically, the husband and the paternal grandmother had allowed the daughter to act out and to engage in verbal and physical aggression *548 without any attempt to discipline her, and had thereby made the wife’s parenting efforts more difficult. Dr. Kerr concluded that the husband’s inability to work together with the wife to set appropriate boundaries and to support the daughter’s mental-health treatment program had ultimately delayed the daughter’s recovery. Dr. Kerr opined that, if asked, the daughter would probably request to be placed in the custody of the husband because he would let her do whatever she wanted and would not give her the discipline or structure that she needed.[1]
McKinney stated that he had been hired by the wife to evaluate the earning capability of the husband. McKinney noted that the husband was 50 years old, that he had earned a master’s degree in economics from Fordham University, and that he had been employed in the banking industry before opening his insurance agency in 1991. At the time of trial, the husband was also the sole owner of an investment company and served on the board of directors of a local bank. Based upon the husband’s education and professional experience, McKinney stated that he could earn between $40,000 and $42,000 annually working directly for a major insurance company. In fact, based on the husband’s years of experience in that industry, McKinney stated that he would more likely earn a salary in the range of $62,000 to $70,000 per year. Moreover, because of the husband’s management experience in the financial and investment industries, McKinney testified that the husband could earn between $90,000 and $113,000 annually in a management position with a local bank.
According to the special master’s valuation of the husband’s businesses, the fair value of the husband’s insurance agency was $500 and the fair value of his share of the investment firm was $170,000. The husband also jointly owned a commercial building with the paternal grandmother; that building housed his two businesses and had been appraised at a value of $520,000. The debt owed on that commercial building was approximately $139,000; thus, the husband’s share of the equity in that building was approximately $190,500 ($520,000 - $139,000 divided by ⅜). The wife asked that she be awarded one-half of the marital interest in those assets.
The wife testified that, although the marital residence had been appraised at $178,000, it needed repairs of approximately $20,000 before it could be placed on the market for sale. The parties still owed about $45,000 on that property at the time of trial. The wife asked that she be allowed to buy the husband’s interest in the marital residence so that she could continue raising the children in familiar surroundings.
In November 2009, the trial court entered a divorce judgment that awarded joint legal custody of the children to the parties but awarded primary physical custody to the wife. The husband was awarded standard visitation with the children and ordered to pay monthly child support in the amount of $660. The wife was instructed to maintain medical-insurance coverage on the children, and the parties were instructed to equally share any of the children’s uncovered health-related expenses. The husband was ordered to maintain life-insurance coverage of at least $500,000 listing the children as primary beneficiaries for as long as he was obligated to pay child support.
*549 The judgment awarded the marital residence to the wife, ordered her to pay the husband $40,000 for his share of the equity in the residence, and ordered the husband to execute a warranty deed conveying his interest in the residence to the wife within 30 days. The husband was awarded 100% of his interest in both of his businesses and in the commercial property that housed his businesses. The husband and the wife were each awarded all interest in their various individual retirement accounts. The husband was awarded bank accounts opened in his own name and his businesses’ names, but the parties were ordered to equally divide the moneys held in their joint checking account and invested in their “whole-life” insurance policies. The wife was awarded one motor vehicle, and the husband was awarded the parties’ remaining four vehicles and boat. Each party was awarded a specific list of personal and household items. Each party was ordered to pay one-half of two specific credit-card debts, and each party was ordered to pay all the indebtedness on two other credit-card accounts.
Both parties filed postjudgment motions, and, following a hearing, the trial court amended the judgment to clarify which credit-card debts were to be paid individually and which were to be split equally between the parties. In addition, the husband was specifically awarded the parties’ Kawasaki four-wheel all-terrain vehicle, and the wife was awarded four specific items of marital property. The wife was also instructed to refinance the marital residence by obtaining a new loan solely in her name and to hold the husband harmless as to any remaining debt secured by that property. The husband, on appeal, challenges the child-custody award, the marital-property division, and the requirement to maintain $500,000 in life insurance during the children’s minority.
When appellate courts review a child-custody determination that was based upon evidence presented ore tenus, we presume the trial court’s decision is correct: “ ‘A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal.’ ” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)). “This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.... ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981).” Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
The husband summarizes in his brief to this court the testimony that, he says, supports his contention that the wife had abused the daughter and had been the underlying cause of daughter’s mental-health issues. He also points out that the daughter had expressed a desire to live with the husband. The problem with the husband’s contention is that there was equally probative testimony indicating that the daughter’s mental-health issues had been exacerbated by the husband’s failure to discipline the daughter and to support the wife in setting academic goals. Rather than belabor the conflicting testimony, we simply acknowledge that “[t]he trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing.” Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996); see also Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). Factual determinations based *550 on conflicting evidence are within the sound discretion of the trial court. See C.B.B. v. J.S.D., 831 So.2d 620, 622 (Ala. Civ.App.2002). Based upon the record presented, we cannot conclude that the trial court erred in its determination to award primary physical custody of the children to the wife.
The husband also asserts that the trial court inequitably divided the parties’ marital assets.
“The trial court is afforded a wide degree of discretion in dividing the marital assets of the parties upon divorce. Moody v. Moody, 641 So.2d 818 (Ala.Civ.App.1994). The only limitation on that discretion is that the division of property be equitable under the circumstances of the particular case, and the task of determining what is equitable falls to the trial court. Ross v. Ross, 447 So.2d 812 (Ala.Civ.App.1984). This court must consider the issues of property division and alimony together when reviewing the decision of the trial court, Albertson v. Albertson, 678 So.2d 118, 120 (Ala.Civ.App.1995), and, because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So.2d 620, 628 (Ala.Civ.App.1993). In making the division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their age and health, their conduct, the duration of the marriage, and the value and type of marital property. Lutz v. Lutz, 485 So.2d 1174 (Ala.Civ.App.1986). The property division made by the trial court will not be set aside on appeal absent a palpable abuse of that discretion. Id.”
Cantrell v. Cantrell, 773 So.2d 487, 489-90 (Ala.Civ.App.2000); see also Ex parte Foley, 864 So.2d 1094, 1097 (Ala.2003).
Although the husband contends that the trial court’s marital-property division was erroneous, we note the statement in Cantrell to the effect that the trial court has the discretion to consider numerous factors when dividing marital property. The husband makes much of the overall monetary percentages of marital property awarded in the divorce judgment; in focusing solely on the relative monetary percentages each party received, he fails to perceive that the trial court awarded him more than he requested and awarded the wife much less than what she had sought. The husband contends that the property division was inequitable because the wife was awarded, by his calculations, approximately 3/4 to 4/5 of the marital estate. However, the evidence from the lengthy trial indicated that the wife had been the family’s primary wage earner and had provided between 2/3 and 3/4 of the funds expended by the parties to acquire the marital assets. In addition, the wife adduced evidence indicating that the husband had systematically underpaid himself, apparently doing so in order to place a greater burden of defraying the household expenses on the wife.
Moreover, the husband was awarded all of his marital interest in the commercial building he jointly owns with the paternal grandmother, his personal retirement accounts, and the equity in his two businesses. A simple review of the numbers does not support the husband’s contention that the division of assets unfairly favored the wife. Neither party requested any portion of the other party’s retirement accounts, so (using the husband’s figures and removing both parties’ retirement accounts) the following allocation of assets is revealed: $258,760.83 to the wife and *551 $261,995.45 to the husband.[2] Under the circumstances presented, that nearly equal division of the parties’ remaining assets cannot be considered an erroneous property division. We conclude that the husband’s contention as to this issue is without merit.
The husband also asserts that the trial court erred in ordering him to “secure” his child-support obligation by acquiring life-insurance coverage in the amount of $500,000.[3] The Alabama Supreme Court has previously stated that “[m]inor children are commonly designated as beneficiaries of life insurance policies as ‘an aspect of child support’ pursuant to an order of divorce.” Whitten v. Whitten, 592 So.2d 183, 186 n. 4 (Ala.1991). “Whether to order a party to maintain a life insurance policy for the benefit of minor children is within the discretion of the trial court.” Kirkland v. Kirkland, 860 So.2d 1283, 1288 (Ala.Civ.App.2003).
The thrust of the husband’s assertion regarding the insurance requirement is that, in his view, his total child-support obligation cannot possibly be more than $61,000. However, the trial court heard evidence tending to show that the husband has had a history of not meeting his financial obligations to and for the family and may well have concluded that the total amount that the husband will eventually owe will be enhanced by pre- and post-judgment interest. In addition, the younger child will not reach the age of majority until July 2017, and, during the intervening years, the husband’s child-support obligation is upwardly modifiable based upon the usual considerations. Moreover, the husband may be required to pay postmi-nority educational support after the children reach the age of majority, and obtaining life insurance to secure those payments at age 58 may be difficult, if not impossible.
Although we might not have decided to levy a similar insurance requirement on the husband, nothing in the judgment prevents the husband from naming the children as beneficiaries on the existing insurance policies awarded to him in the divorce. Although the record contains evidence of the present value of the parties’ whole-life insurance policies, we do not have the face value of those policies; it is likely that the face value of the preexisting policies awarded to the husband equal or exceed the amount ordered by the judgment. Because the husband has not presented record error as to this issue, we cannot conclude that the trial court committed reversible error by ordering the husband to secure his child-support obligation with $500,000 in life-insurance coverage.
The trial court’s judgment is due to be affirmed. In addition, the wife asks this court for an award of $5,000 in attorney fees for defending the trial court’s judgment (as to which, she claims, the law is well settled regarding each issue raised). The wife’s request for an attorney-fee award on appeal is granted in the amount of $2,500.
affirmed:
THOMPSON, P.J., and THOMAS, J., concur.
*552 MOORE, J., concurs in part and dissents in part, with writing, which BRYAN, J., joins.

. Interestingly, at trial, the daughter actually opined that she would prefer not to live with either parent.

. These figures were computed by removing the wife's state retirement account, her two individual retirement accounts, and the husband's individual retirement account from the figures presented in the husband's appellate brief.

. We note that the husband does not assert that the trial court's life-insurance mandate is an improper deviation from the requirements of Rule 32(A), Ala. R. Jud. Admin.